The plaintiff seeks to have a parol or resultant trust declared in her favor respecting certain lands to which the defendant now claims title through the instruments hereinafter mentioned. The plaintiff claims that she paid the purchase price of the lands through a son, J. E. Creech, on a parol agreement that the latter would take title in the name of himself and wife and hold the lands for her temporarily, to be reconveyed to her as she should require. She alleges that thereafter the son, contrary to the trust, conveyed the lands to J. M. Creech, then husband of plaintiff, but afterwards divorced, who took title to the lands with a knowledge of her equity; and that the lands came into the hands of the defendant, his second wife, by the will of J. M. Creech, charged with this equity.
The defendant denied the material allegations of the complaint, alleging that the deed of J. E. Creech to the father, J. M. Creech, was in pursuance of the parol trust agreement between the plaintiff, J. M. Creech and J. E. Creech, and that no trust in favor of plaintiff — resulted therefrom. Defendant also alleged that the action was barred by the three-year statute of limitation (C. S., 441); that the parol trust attempted to be set up was in contravention of the statute of frauds; and that plaintiff's action was barred by her own laches.
In support of her claim, plaintiff introduced evidence from which we summarize parts pertinent to the decision:
The documentary evidence of plaintiff consisted in part of the deed of W. P. Aycock and Winfield H. Lyon, Commissioners, to J. E. Creech, et ux, recorded 21 February, 1933, in Book 30, page 321, in the office of the Register of Deeds of Johnston County; deed of J. E. Creech and wife, Mary Creech, to J. M. Creech, registered in the office of the Register of Deeds of Johnston County, in Book of Deeds 375, page 481, et seq., 22 November, 1937. Both deeds are absolute in form, purporting to convey the same property and reciting the same consideration ($1,430.00). *Page 658 
Testifying in her own behalf, Zilphia Creech, plaintiff, deposed:
That before her marriage to Rev. J. M. Creech in April, 1896, she was Zilphia Aycock, the daughter of Joe Aycock, from the division of whose estate she had acquired certain property; that after her marriage to J. M. Creech, she built a house on the land she got by division from her father's estate and she and her husband went to live on it, and she farmed it. Later, this land was sold and plaintiff bought with the proceeds a tract of land from John F. Wellons, living there for fifteen years, farming it and raising cotton, selling it and living on it. Plaintiff testified that she sold the cotton and lived on the money, as far as it went; that she accumulated crops grown on this land, principally cotton. She further testified that she sold her cotton grown on the Wellons land, saved the money and put it in the post office in Smithfield; that she had as much as $1,430.00 in money on hand 13 February, 1933; that she drew her money out of the post office, gave it to her son, J. E. Creech, to buy the Fulghum place — the lands in controversy — for herself; that J. E. Creech and wife paid nothing on the purchase price. Recalled, she stated that she gave J. E. Creech the money to buy the land for herself; that she did not give J. E. Creech and his wife any direction or authority to convey the land in controversy to J. M. Creech and got no money from them.
Mrs. Ida Martin testified that she had been for many years past postal savings clerk at the Smithfield post office and had custody of the records of the office, and presented certain records which she testified were made by her and under her supervision. The record disclosed that Mrs. Creech, the plaintiff, opened a savings account in the postal saving department 27 January, 1930, and the account was closed 15 February 1933, at which time Mrs. Creech drew out $1,015.00.
J. E. Creech testified that his mother had thirty bales of cotton accumulated from her cotton from the Wellons tract; that she placed the proceeds of this cotton in the postal savings department in the post office at Smithfield and that he knew what became of the money. His mother the plaintiff, gave him the money — not as a gift — but to pay for the land for herself, asking him to take title in the name of himself and wife that she gave no instruction or authority to make the title to anybody else. That he did not pay his mother anything after the deed was executed by himself and wife to J. M. Creech.
J. M. Creech, Jr., testified that he was the youngest son of J. E. Creech; that he knew of the surplus crops raised by his mother on her Wellons land — mostly cotton — which she stored in the shed at home. That she afterwards sold it, carrying the money to the post office for safekeeping. That he remembered about the time of the purchase of the Fulghum land, and knew that his mother furnished the money with *Page 659 
which to buy it. He testified that his mother told his brother, J. E. Creech, to take the title to the land and keep it for awhile, until further notice from her.
He testified that his father told him that they got together — that is, his mother and father — and decided that they would let Joe have title to the land until they let him know what they were going to do about it. The mother was not present at the time of this conversation — which was the time title was taken, February, 1933. In November, 1937, while Mrs. Creech was in Fayetteville visiting a sick daughter, witness went with his father to the home of J. E. Creech. J. M. Creech told the witness that he "was going to have the deed to the land," as he might probably need it to get money on "right quick" while he was "preaching around" — it would be a good idea to have some security to borrow money. Witness replied that he thought it "all right" and J. M. Creech went to J. E. Creech, brother and son of witness and J. M. Creech, and got the deed.
D. B. Oliver, a witness for the plaintiff, testified that he had a conversation with Rev. J. M. Creech during the latter part of November, 1937 — in October — at that time Creech applied to him for a loan of $250.00, of which he said he was in urgent need. Witness said that he told Creech that the latter already owed him about $300.00 on an open account; that if he would secure that and his wife would sign the note, he would let him have the money. Creech said, "No, I will not ask her to sign any more notes." He further said that he had some property, the Fulghum land, "have got a deed to it in my own name, bought and paid for," and offered to give him a mortgage on the Fulghum land, and said he had the deed with him.
M. H. Howell, a witness for the plaintiff, testified that he had a conversation with Rev. J. M. Creech with reference to conveyance of the Fulghum tract of land to J. E. Creech and wife. Creech stated to the witness that Fulghum was an uncle and that Creech wished to keep the property in the family. "He said he asked his wife to `let's sell her cotton and buy that farm and keep it in the family.' He told me he had sold his cotton and put the money in the Postoffice to pay for that place. And after he sold it I talked with him about it and he said he had bought the place, his wife had bought the place."
There was also testimony to the effect that Creech sometimes referred to the purchase of the Fulghum land as having been made by himself and sometimes as having been made by his wife and himself; and also that he stated he had "sold his cotton and put the money in the Post Office to pay for that place," and afterwards stated that "he had bought the place, his wife had bought the place." There was evidence tending to show generally the impecunious condition of J. M. Creech and *Page 660 
his protracted absence from home during periods covered by farming operations. There was also evidence of admissions on the part of J. M. Creech, made some time in 1937, that it took what he got in his preaching work to "keep the expenses down with him and Miss Hunnings" — then employed by him in the evangelistic work — and after his divorce from plaintiff, his wife, the present defendant — and that he "didn't get any money to send home." There was other evidence bearing upon his financial condition.
The evidence is voluminous, and it is not thought necessary to consume more space upon this phase of the case.
The defendant, by pertinent exceptions, covered other phases of plaintiff's evidence offered in support of her contentions, which it is necessary to summarize with distinguishing references to the exceptions.
Over objection and exception of defendant, a witness, J. K. Hartley was permitted to state that Miss Hunnings had an automobile which Mr. Creech admitted buying for her (Exception No. 96, R., p. 47); that he saw Mr. Creech give Miss Hunnings a $50.00 check, which she torn up and threw down, stating that if he would not give her any more than that, she would not have any. Whereupon, he wrote her a $75.00 check. Witness stated, "Miss Hunnings was mad; she kicked him on the legs and rubbed her fists in his face" (Exception 101, R., p. 48); "and told him if he could not give her more than that she would not have any and she would see what she could do with him" (Exception 102, R. p. 48).
Witness was further permitted to say, over objection, that Creech told him Miss Hunnings was "over-bearing in everything, and was calling on him for money and he didn't have it, and said he had sent home for some money — that she was just over-bearing with him, and forbid him doing anything only just for her, and said he was afraid of her" (Exception 105, R., p. 49); "he said that he didn't know what she would do with him if he was to do that" (Exception No. 106, p. 49). The witness further testified over objection that Miss Hunnings said to him: "She said if he came home — she dared him to come home, and said his people were bad to him, his wife and family were bad to him and made home miserable for him, and she forbid him going home on that account. (Exception 114, R., p. 50.)
Further, this witness was permitted to testify that Creech told him that she, Miss Hunnings, "proposed to him to marry her, but he would not leave his first wife and marry another as good as she was to him (Exception 120, p. 52.) Witness further testified, over objection, that Miss Hunnings told witness that "she would kill him; that he should not go back." (Exceptions 124 and 125, R., p. 52.) *Page 661 
Witness further testified, over objection, that Creech told him that he (Creech) was afraid of Miss Hunnings.
Over the objection of defendant, plaintiff was permitted to introduce the entire record of the divorce proceeding in the State of Florida, which resulted in the divorce of Creech from the plaintiff and his marriage to Miss Hunnings, now Beulah Creech, the defendant. (R., pp. 91-109).
The defendant moved for judgment as of nonsuit at the conclusion of plaintiff's evidence, and again at the conclusion of all the evidence, and the motion was overruled.
Issues were framed and the cause submitted to the jury. Upon favorable answer to the issues, judgment was signed in favor of the plaintiff. Defendant appealed, assigning errors as covered by numerous exceptions.
Due to the vigilance of counsel during the trial, an unusual number of exceptions were taken. This has demanded careful perusal of the record, but the basis of decision relieves the Court of a more detailed report of our conclusions.
For the purpose of discussion, two questions may be posed: (a) Whether the evidence was sufficient to go to the jury on plaintiff's allegation that a trust exists in her favor on the lands described in the complaint; and (b), whether there was error in the admission of evidence introduced in her behalf to support the claim.
Usually an exception to the denial of a motion to nonsuit on the evidence demands priority of consideration, since upon it depends further action and expense of the parties in litigation and further travail of the courts; and the just and speedy determination of a controversy is much to be desired. In this case, however, we feel that the more important of these desirables is, under the evidence, a question for the jury.
I. While we do not wish to direct the course of the trial below any more than may be necessary, we do feel that, in order to avoid further resort to this Court upon unsettled questions, it is incumbent upon us to deal with some of the legal questions presented in the argument and contentions of the parties.
At this stage of the case the label we apply to the trust sought to be established by the plaintiff is of no great importance — whether a resulting trust arising by operation of law, or an express trust arising out of a parol agreement — since the evidence may be sufficient to establish either, or failing in one, it may be sufficient as to the other.
The overwhelming weight of authority recognizes the general rule that in the absence of circumstances indicating a contrary intent, where *Page 662 
the purchase price of property is paid with the money of one person and the title is taken in the name of another, for whom he is under no duty to provide, a trust in favor of the payor arises by operation of law and attaches to the subject of the purchase. Harris v. Harris, 178 N.C. 8,100 S.E. 125; Avery v. Stewart, 136 N.C. 426, 48 S.E. 775; Summers v.Moore, 113 N.C. 394, 18 S.E. 712; 26 R. C. L., 1219, s. 64, note 1; 65 C. J., p. 382, s. 154 (5), note 14. The presumption is regarded as so powerful that the payment of the purchase price under such circumstances draws the equitable title to the payor "as if by irresistible magnetic attraction." Ricks v. Wilson, 154 N.C. 282, 286, 70 S.E. 476. And a resulting trust in favor of the party paying the consideration will arise, although the conveyance is made to another with the knowledge and consent of the payor. Summers v. Moore, supra. Such a trust may be established by parol evidence.
It is true that, nothing else appearing, the purchase by a father who takes title in the name of a child will not raise a presumption of trust, but, on the contrary, the purchase will be presumed to be an advancement to the child — Egerton v. Jones, 107 N.C. 284, 12 S.E. 434; and we may concede that this presumption has been broadened in this country to include purchase by a mother under like circumstances, although the English rule predicated the presumption not upon the bare parental relation, but upon the duty of the father to provide for the child, and the original basis for the rule does not exist in the case of a married woman. Underhill, Trusts and Trustees, 9th Ed., p. 172. However this may be, in any event the presumption is one of fact and not of law, and may be rebutted by evidence of circumstances tending to show a contrary intent or that the purchaser did not intend the ostensible grantee or grantees to take beneficially. Underhill, Trusts, p. 169. In the case at bar, there is evidence from which such contrary intent may be inferred.
Without impairing the validity or application of the foregoing rules it may be noted that the transaction under review had the substantial indicia
of an express parol trust. The declaration of trust need not be explicit, but the nature and terms of the transaction may give rise to an express trust and no formality of words is necessary where the unequivocal intent can be determined from the attending circumstances Laws v. Christmas,178 N.C. 359, 100 S.E. 587; Rousseau v. Call, 169 N.C. 173,85 S.E. 414; Blackburn v. Blackburn, 109 N.C. 488, 13 S.E. 937. We have no doubt that where the property is purchased with the funds of another, who pays the purchase price upon the express condition that the purchase shall be for his benefit and that the title shall be taken and held in the name of the agent, who himself carried out such instruction, the act of the latter in compliance therewith will imply assent and agreement, and supply a want of direct or express promise to hold the lands in trust. *Page 663 
Trusts of the character above outlined may be established by parol evidence. The seventh section of the English Statute of Frauds has not been enacted in this State, and the creation of such a trust in the manner indicated does not contravene our statute of frauds. C. S., 988. Peele v.LeRoy, ante, 123, 22 S.E.2d 244; Anderson v. Harrington, 163 N.C. 140,79 S.E. 426; Newby v. Realty Co., 182 N.C. 34, 108 S.E. 323;Brogden v. Gibson, 165 N.C. 16, 80 S.E. 966. Under the trust theory, the taker of the original title never had any beneficial interest — "The legal title is a mere naked form and only evidence of title in favor of the cestui que trust because his money paid for it," 26 R. C. L., Trusts, section 73 — and once sufficient basic facts are established, equity will, when necessary, enforce or execute the trust against the person so holding, in invitum.
Applying these standards to the case at bar, we think there is evidence — of whatever weight the jury alone may say — tending substantially to support the claim that a trust in favor of plaintiff has resulted and become attached to the legal title held by defendant, because of the transactions competently presented in the testimony, notwithstanding such contradictions as may appear therein.
The courts are slow to substitute doctrinal uncertainties for the well considered and easily applied legislative enactments. On the question of laches, the tendency is to measure laches by the pertinent statute of limitations wherever the latter is applicable to the situation and not to regard the delay of the actor to assert the right within that period effective as estoppel, unless upon special intervening facts demanding that exceptional relief. We do not find that the equities between the parties have been affected by any change of circumstances due to the lapse of time that would justify the application of the doctrine to the facts of the present case.
Plaintiff's action is not based upon fraud or mistake in the execution of the deed conveying a legal title upon which she seeks to engraft a parol trust. In Briley v. Roberson, 214 N.C. 295, 199 S.E. 73, action was brought by the grantor to reform a deed which he himself had made. See TireCo. v. Lester, 192 N.C. 642, 135 S.E. 778. The right of the plaintiff is, therefore, not subject to the three-year statute of limitation, as defendant suggests. The appropriate statute, if any might be applicable to the case, is C. S., 445 (Code, sec. 158). Norton v. McDevit, 122 N.C. 755,759, 30 S.E. 24. Plaintiff's action was commenced 26 August, 1940; and both the commissioner's deed to J. E. Creech, upon which the action is based, and the deed of J. E. Creech to J. M. Creech, which plaintiff claims violated the trust, were executed within the ten-year period next preceding the commencement of the action. *Page 664 
Upon the record before us, the statute of limitations is not available to defendant.
The motion to nonsuit was properly denied.
II. The defendant complains that the trial of the case was discursive and took in more of the surrounding scenery than was good for the jury. Generally, the complaint is that although the evangelist Creech, to whose subversive activities most of plaintiff's legal difficulties are attributed, was dead, and although Mrs. Beulah Creech, the second wife and defendant in the action, did not go upon the stand, the character of each of them was attacked by plaintiff's evidence, and this by testimony directed to specific delinquencies. This testimony was concerned largely with relations between these parties before the plaintiff was divorced from Creech in Florida and the defendant became married to him.
The issue before the court was not which of the two contenders was more morally fit to have custody of the Fulghum land, but whether the land came into the hands of the defendant affected with the alleged equity in favor of the plaintiff. We are unable to see how the character of the parties, or the suggested misconduct of either Creech or the defendant, has relevancy to this issue. Much of the evidence covered by the exceptions tended only to show marital disloyalty on the part of Creech, induced by the defendant, and her control of him, whatever its secret, and has no appreciable bearing upon the existence of the trust however it may have contributed, incidentally, to its breach. On the other hand, the evidence may be criticized as staging a drama as old as Adam and Lilith, and as modern as yesterday's newscast, in which the designing woman, the philandering husband and the wronged wife etched and framed with no mean artistry, might move the jury to follow the principles of poetic justice rather than rules of law. The prejudicial tendency of evidence of this character is gravely apparent.
It is, of course, not our intention to approve of all the evidence admitted over defendant's objection and not here specifically pointed out, nor to approve of all the exceptions to the evidence which have been taken on the trial, in many of which we do not find merit. Consideration seriatim
of the 167 exceptions taken by the defendant, most of them to the admission of evidence, would not, we think, add anything new to the volume of learning on that subject, and we prefer to leave at least something to the sound legal judgment of those who undertake to develop and present the case anew. We have attempted above to summarize the more meritorious of defendant's exceptions; and for error in the admission of the indicated evidence, the defendant is entitled to a new trial. It is so ordered.
New trial. *Page 665